# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ACUSHNET COMPANY, et al.<br><br>Plaintiffs,<br><br>v.<br><br>DEREK McMURDIE, et al.<br><br>Defendants. | **MEMORANDUM DECISION: FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 4:23-cv-00025<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Paul Kohler |

## INTRODUCTION

Plaintiff Acushnet Company[1] filed this action against Defendants Derek McMurdie, Taylor McMurdie, Jax McMurdie, and Lemon and Lucy, LLC, alleging, among other things, trademark counterfeiting.[2] Defendants appeared briefly through counsel to file an answer to the complaint, but since then they have failed to comply with Court orders and otherwise participate in the litigation, in spite of repeated notices.[3] Accordingly, the Court determined that a default judgment against Defendants was warranted as a sanction and directed Acushnet to file a proposed judgment and an affidavit identifying its damages.[4]

---

[1] This action was initiated by Acushnet and Scott Cameron Golf Design, but Acushnet has since acquired all of Scott Cameron Golf Design's rights to the marks at issue, so the Court will only refer to Acushnet in this decision. *See* ECF No. 62 at 1 n.1. Pinpoint citations to documents in the record refer to the electronic page numbers generated by CM/ECF.
[2] ECF No. 2 at 1, 4, 18–21.
[3] ECF No. 20 at 1; *see* ECF No 21 at 1; ECF No. 22 at 1; ECF No. 26 at 1–2; ECF No. 28 at 1; ECF No. 36 at 1; ECF No. 38; ECF No. 39 at 1–2; ECF No. 40 at 1; ECF No. 42 at 1; ECF No. 42-1 at 1; ECF No. 44 at 1, 4, 7, 10, 13; ECF No. 45; ECF No. 46; ECF No. 47 at 1; ECF No. 48.
[4] ECF No. 28 at 1, 4.

In compliance with the Court's order, Acushnet filed a motion for default judgment, along with supporting exhibits and declarations.[5] The Court then conducted an evidentiary hearing on the proposed default judgment pursuant to Federal Rule of Civil Procedure 55.[6] Defendants did not appear despite the Court's efforts to provide notice.[7] At the conclusion of the hearing, the Court directed Acushnet to prepare a set of proposed findings of fact and conclusions of law, which are now before the Court.[8] Based on the evidence presented by Acushnet in its filings and at the evidentiary hearing, the Court finds and concludes as follows.

## FINDINGS OF FACT

### I.  Acushnet and its Marks.

Acushnet manufactures and distributes high-quality golf products.[9] It is the owner and registrant of the following trademarks, each of which is listed in the category for golf clubs on the Principal Register of the United States Patent and Trademark Office (the "Marks"):[10]

---

[5] ECF No. 35 at 1, 21–22; ECF No. 35-1 at 1; ECF No. 35-2 at 1; ECF No. 35-3 at 1; ECF No. 35-4 at 1; ECF No. 35-5 at 1.
[6] ECF No. 48; ECF No. 51 at 5; *see* Fed. R. Civ. P. 55(b)(2).
[7] ECF No. 48; ECF No. 51 at 7.
[8] ECF No. 48; ECF No. 51 at 186; ECF No. 62 at 1.
[9] *See* ECF No. 51 at 52-59.
[10] *See* ECF No. 51 at 46, 49; ECF No. 62-1 at 40–41, 43–44, 46–47, 52–53, 55, 57. In its filings, Acushnet highlights TITLEIST, Registration No. 1,273,662, but this mark is not registered for use in the category for golf clubs. *See* ECF No. 62-1 at 40. Even so, the Court takes judicial notice that an identical mark is registered in the category for golf clubs. *See* TITLEIST, Registration No. 1,155,766; *see also* Fed. R. Evid. 201(b), (c) (providing that the Court may, "on its own," take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Nationwide Van Lines, Inc. v. Transworld Movers Inc.*, 853 F. App'x 604, 605 (11th Cir. 2021) (unpublished) ("The district court was entitled to take judicial notice of the federal trademark registration in resolving who owned the mark.").

   SCOTTY CAMERON

Registration No. 1,155,766    Registration No. 3,376,961    Registration No. 2,527,400    Registration No. 2,525,024

The Marks are well-known and appear throughout the world on various goods.[11]

Of particular importance here are Acushnet's limited-edition Scotty Cameron putters, which are manufactured and distributed as collectors' items and generally not intended for use on the course.[12] Because of their value, there is a robust secondary market for these goods.[13] While Acushnet only distributes the putters in their completed form, the secondary market features separate putter heads and putter grips as well.[14] For this reason, Acushnet considers putters, putter heads and putter grips to be distinct types of goods, and knowledgeable collectors use these items to fashion unique club configurations, recognizing that certain combinations of the Marks, along with other characteristics, can substantially increase the value of a club.[15] Acushnet sees this

---

[11] *See* ECF No. 51 at 18, 46–47, 52–59; ECF No. 62-1 at 222–25, 227–30.
[12] *See* ECF No. 51 at 53, 57, 68.
[13] *See id.* at 57–58, 67–68.
[14] *Id.* at 67–70.
[15] *Id.* at 57–58, 67–71.

secondary market as a source of additional goodwill and value for the Marks but also polices the market aggressively, dedicating considerable resources to investigating potential counterfeits.[16]

## II. Defendants.

The individual Defendants here are members of the same family: Derek and Taylor are husband and wife, and Jax is their oldest child.[17] Defendant Lemon & Lucy, LLC is an entity owned and operated by Defendant Taylor McMurdie.[18]

The McMurdies are a golf family.[19] Derek and Jax play golf, Jax participates in tournaments with Derek as his coach, Taylor works in the golf industry, and the family has lived next to a golf course for several years.[20] In addition, the McMurdies are quite familiar with Acushnet's products and brands.[21] Jax has used Acushnet hashtags on social media, Jax and Derek use Acushnet clubs and bags (the family even featured a Titleist bag when they hosted a gender reveal party), and the whole family wears apparel featuring the Marks, some of which they procured through their prior membership in Acushnet's "Club Cameron," a high-profile club for fans of the Scotty Cameron brand that provides access to exclusive products as well as the opportunity to purchase certain products before the general public.[22]

Defendants are prolific users of various ecommerce platforms. Derek McMurdie operates an eBay account and a Mercari account, which is linked to Jax McMurdie's bank account, to market and sell jewelry, golf equipment, and other items.[23] At least one member of the family has

---

[16] *See id.* at 47–48, 60, 67–69.
[17] ECF No. 51 at 82–86; *see* ECF No. 62-1 at 102–12.
[18] ECF No. 62-1 at 27, 124, 126, 242; *see* ECF No 51 at 92–93.
[19] *See* ECF No. 62-1 at 102–12.
[20] *See* ECF No. 51 at 84–91; ECF No. 62-1 at 102, 104–106, 108–12, 114–16, 118–19, 121–22.
[21] *See* ECF No. 51 at 83–89; ECF 62-1 at 108–09, 111–12, 117.
[22] *See* ECF No. 51 at 83–89, 115–18; ECF No. 62-1 at 108–09, 111–12, 117.
[23] *See* ECF No. 62-1 at 134–45, 253–57.

also marketed and sold goods online using the alias "Tom Kim."[24] The family has used Lemon and Lucy's address to ship merchandise and, as the point of contact for the company, Taylor McMurdie has corresponded with purchasers.[25]

### III.     Defendants' Scheme.

In 2022, Acushnet began receiving reports of fake Scotty Cameron goods being sold on the secondary market.[26] One such report came from an experienced collector named Matthew Gaynor, who purchased putters and putter heads bearing the Marks, as well as some other merchandise, on Mercari from Derek McMurdie.[27] The Mercari listings caught Mr. Gaynor's eye because they featured unique Titleist, "Circle T," and Scotty Cameron branding, as well as special "009" and "GSS Proto" markings, all of which are signals to knowledgeable collectors of rare and valuable products.[28] After observing that the asking price for the goods was consistent with prevailing market rates, Mr. Gaynor moved forward with his purchases.[29] When he received the goods, however, Mr. Gaynor noticed that the stamping and milling on some of the products was subpar compared to other Acushnet products he had seen.[30] After conferring with other knowledgeable individuals, Mr. Gaynor concluded that the products he received were knockoffs.[31]

Mr. Gaynor contacted the seller through Mercari to ask for a certificate of authenticity for the goods.[32] The seller agreed to provide a certificate for some of the items and gave Mr. Gaynor

---

[24] *See* ECF No. 62-1 at 135, 154, 156
[25] *See* ECF No. 51 at 35–42; ECF No. 62-1 at 24, 27, 29–38.
[26] *See* ECF No. 51 at 59.
[27] ECF No. 51 at 17–29, 101–102; ECF No. 62-1 at 2, 4–5, 7, 9–10, 12, 14–16, 132–35.
[28] ECF No. 51 at 20–29; ECF No. 62-1 at 2, 4–5, 7, 9–10, 12, 14–16.
[29] *See* ECF No. 51 at 19–27.
[30] *See id.* at 21–25.
[31] *See id.* at 21–25, 30, 41–42.
[32] *Id.* at 31–33; ECF No. 62-1 at 19.

a tracking number for the shipment.[33] Mr. Gaynor subsequently received a package from Lemon and Lucy, but it only contained a broken watch battery.[34] When Mr. Gaynor attempted to follow up with the seller through Mercari, he received no response.[35] Using the shipping information from the package, Mr. Gaynor found a phone number for Lemon and Lucy belonging to Taylor McMurdie.[36] Hoping to get a refund, Mr. Gaynor texted Taylor, who claimed she was not the seller but also declined to put Mr. Gaynor in contact with them.[37] Instead, she attempted to negotiate with Mr. Gaynor on behalf of the seller, stating that his requested refund was excessive and "not a top priority" for her.[38] Ultimately, Mr. Gaynor did not receive a refund and sent the inauthentic goods to Acushnet.[39] When Mr. Gaynor relayed his experience to other members of the collectors' community, they told him he had been "McMurdie'd"—that is, deceived into buying fake merchandise.[40]

Acushnet initiated an investigation, which revealed that the McMurdies were using multiple online platforms to offer and sell the following inauthentic goods with the following Marks: putters bearing each of the Marks, putter heads bearing each of the Marks, and putter grips bearing the "Circle T" mark, "Dancing" Scotty Cameron mark, and standard Scotty Cameron mark.[41] Acushnet was able to conclude that the McMurdies' offerings were knockoffs because they were inconsistent with the company's unique and proprietary branding and manufacturing

---

[33] ECF No. 51 at 34; ECF No. 62-1 at 19–22.
[34] ECF No. 51 at 34; ECF No. 62-1 at 24–25.
[35] ECF No. 51 at 35; ECF No. 62-1 at 22.
[36] ECF No. 51 at 35–36; ECF No. 62-1 at 24, 27.
[37] See ECF No. 51 at 37–42; ECF no. 62-1 at 29–38.
[38] ECF No. 62-1 at 32; see ECF No. 51 at 37–42; ECF No. 62-1 at 29–38.
[39] ECF No. 51 at 42.
[40] See ECF No. 51 at 42–43; ECF No. 52 at 29; ECF No. 62-1 at 152.
[41] See ECF No. 51 at 59–60, 64–66, 73–75, 79–81, 103–04, 119–20; ECF No. 52 at 12–33; ECF No. 62-1 at 60–75, 77–100, 134–45, 236–37, 239–40.

practices.[42] All told, Acushnet recovered two putters, four putter heads, and two putter grips sold by the McMurdies and also identified several other items sold or offered for sale by the McMurdies that were not recovered.[43]

Deception was a key component of the McMurdies' scheme, as the promotion of their listings sometimes involved the use of a false name or a fictional narrative that the products were being sold by a widow on behalf of her late husband.[44] Further, Acushnet's investigation showed that the McMurdies were not only the sellers of their inauthentic goods, but also the manufacturers, as they used a stamping kit purchased from China to add the Marks to the products they offered.[45] Some of these products also included monogram stamps such as "JAX MC," apparently a reference to Jax McMurdie.[46]

Acushnet sent a cease-and-desist letter to Defendants, requesting, among other things, that they identify their sales accounts and provide a summary of all their sales of goods bearing the Marks.[47] Defendants did not comply with these requests, but when counsel for Acushnet was eventually able to speak with Taylor McMurdie, she admitted that Defendants had purchased the stamping kit and discarded it, along with some clubs they had stamped but not yet sold, after

---

[42] *See* ECF No. 52 at 4–28.
[43] *See* ECF No. 51 at 103–04; ECF No. 52 at 18–19; 22–25, 27–28, 31–33; ECF No. 62-1 at 60-97, 100.
[44] ECF No. 51 at 108–15; *see* ECF No. 62-1 at 140, 147–48, 150, 154, 156.
[45] *See* ECF No. 51 at 94–98, 129–30; ECF No. 52 at 24.
[46] ECF No. 51 at 73–74; ECF No. 52 at 32; ECF No. 62-1 at 77, 97.
[47] ECF No. 51 at 94–98; ECF No. 62-1 at 128–30.

receiving the cease-and-desist letter.[48] In addition, around the time when word of the McMurdies' activities began to spread, they reduced the price of some of their listings.[49]

## CONCLUSIONS OF LAW

Broadly speaking, Acushnet asks the Court to conclude that Defendants have violated Section 32 and Section 43(a) of the Lanham Act by willfully counterfeiting the Marks and, as a result, are liable for $22,000,000 in damages, plus attorneys' fees and costs. The Court will first analyze Acushnet's Lanham Act claims and then discuss whether Acushnet has established willful counterfeiting. The Court will then turn to an evaluation of the appropriate measure of damages and determine whether an award of attorneys' fees and costs is warranted.

### I.  Defendants Are Liable for Violations of Section 32 and Section 43(a) of the Lanham Act.

As noted, Acushnet is pursuing two avenues for relief under the Lanham Act. The first is Section 32, which provides relief for a mark's "registrant" against any unauthorized "reproduction, counterfeit, copy, or colorable imitation of [the mark] in connection with the sale, offering for sale, distribution, or advertising of any goods" if "such use is likely to cause confusion." 15 U.S.C. § 1114(1)(a). The second is Section 43(a), which provides relief for any party harmed by the use "in connection with any goods" of "any false designation of origin" that "is likely to cause confusion . . . as to the origin" of the goods. 15 U.S.C. § 1125(a)(1). Thus, where the plaintiff is the registrant of the marks at issue, as is the case here, the elements of infringement under these two provisions are identical, and Acushnet can establish a claim under each one by showing that (1) it "has a protectable interest in the [M]ark[s]," (2) Defendants "used an identical or similar

---

[48] *See* ECF No. 51 at 94–98, 129–30; ECF No. 52 at 24, 32–33; ECF No. 62-1 at 128–30, 212–13, 217–18; *see also* Fed. R. Civ. P. 36(a)(3) (providing that a request for admission is deemed admitted if the recipient does not respond within 30 days).
[49] *See* ECF No. 51 at 72, 76; ECF No. 62-1 at 29–38, 83–84, 152.

mark in commerce," and (3) "[D]efendant[s'] use is likely to confuse consumers." *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (internal quotation marks and citation omitted); *see Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir. 1987) (noting that Section 32 and Section 43(a) claims involve "similar test[s]," the difference being that Section 43(a) is designed "for infringement of an unregistered trademark by a junior user").

Here, Acushnet has satisfied the first element of its claims because the registrations of the Marks sufficiently establish that it has a protectable in the Marks. *See* 15 U.S.C. § 1115(a) (stating that a registration is "prima facie evidence of the validity of the registered mark" and "the registrant's ownership of the mark."). The Court also has no trouble concluding that Defendants used identical or similar marks in commerce, as the record is replete with evidence indicating that they acted together to create, market, sell, and ship goods bearing nearly exact duplications of the Marks. Thus, the only remaining element for the Court to analyze is likelihood of confusion.

In assessing likelihood of confusion under Section 32 or Section 43(a) the Court considers the following: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) the relation in use and manner of marketing between the goods or services marketed by the competing parties; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 99 F.4th 1150, 1163 (10th Cir. 2024) (internal quotation marks omitted). These factors are not exhaustive, and "the weight afforded to some of the factors differs" depending on the context. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999).

On balance, these factors make clear that Defendants' conduct was likely to cause confusion. First, Defendants used branding virtually identical to the Marks. The record contains

numerous photographs to confirm this and also demonstrates that even knowledgeable consumers only suspected Defendants' goods to be inauthentic upon close personal inspection. Second, the record clearly demonstrates that Defendants intended to unlawfully profit from Acushnet's goodwill and reputation. Notably, Defendants were not merely ignorant peddlers reselling preexisting knockoffs; to the contrary, they affirmatively procured a stamping kit from overseas so they could brand ordinary goods with Acushnet's Marks and resell them at prices fit for high-value collectors' items. Third, there is strong evidence of actual consumer confusion, as Acushnet has highlighted multiple examples of consumers who purchased goods from Defendants under the sincere impression that they were authentic Acushnet products. Fourth, because Defendants, like Acushnet, marketed goods bearing the Marks as collectors' items, the Court can conclude that there is a close relationship between the use and marketing practices of the goods at issue. Of course, Defendants were working in a secondary market, but this does little to help their case, as the record establishes that the goods they offered (e.g., separate club heads) are only available on the secondary market. Fifth, purchasers of Defendants' goods are likely to exercise a higher degree of caution because Scotty Cameron products are high-end goods and the secondary market for them seems to be populated largely with knowledgeable consumers. Even so, the Court gives little weight to this factor because, as noted previously, Defendants' goods looked authentic enough (at least online) to deceive those knowledgeable consumers. Sixth, Acushnet has demonstrated that the Marks are quite strong, as they are world-renowned and indicative of Acushnet's substantial goodwill in the golf industry. Thus, the record contains ample evidence of likelihood of confusion, and the Court therefore concludes that Defendants' have violated Section 32 and Section 43(a) of the Lanham Act.

## II.     **Defendants' Engaged in Willful Counterfeiting, and Enhanced Statutory Damages Are Warranted.**

Section 35(c) of the Lanham Act allows a plaintiff "[i]n a case involving the use of a counterfeit mark" to pursue "an award of statutory damages" in lieu of actual damages and the defendant's profits. 15 U.S.C. § 1117(c). In an ordinary case, these statutory damages range from $1,000 to $200,000 "per counterfeit mark per type of goods," but that range can extend up to $2,000,000 if a court "finds that the use of the counterfeit mark was willful." *Id.* Accordingly, this Court will begin this section of its analysis by addressing the threshold question of whether Defendants' Lanham Act violations amounted to counterfeiting. Then, the Court will discuss whether Defendants' violations were willful, thereby triggering enhanced statutory damages.

   a.   Defendants' Engaged in Counterfeiting.

For purposes of Section 35(c)(2), a "counterfeit mark" is "a counterfeit of a mark . . . that is in use" and "registered on the principal register" for the type of goods at issue, and "counterfeit" means "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. §§ 1116(d)(1)(B)(i), 1117(c), 1127; *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 468 (S.D.N.Y. 2017) ("In determining whether one mark is a counterfeit of another, a court must not view them in the abstract. Rather, the alleged counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser." (internal quotation marks omitted)).

Here, Defendants' conduct involved the use of counterfeit marks. As outlined above, each of the Marks is registered and in use in the category for golf clubs, which is the type of goods that Defendants were offering. In addition, as demonstrated by the many photographs in the record and the evidence that even knowledgeable collectors were fooled into buying Defendants' goods, the

11

inauthentic branding that Defendants placed on their products was nearly identical to the Marks. Thus, the Court concludes that Defendants used counterfeit marks in violating the Lanham Act.

    b. <u>Defendants Acted Willfully.</u>

The Lanham Act provides little guidance on what constitutes "willful" trademark counterfeiting under Section 35(c)(2), and this Court is unaware of any controlling authority on the subject. In general, however, a "willful" violation of a civil statute is one that is "knowing" or "reckless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). This general definition is consistent with the decisions of other district courts in Section 35(c)(2) cases, which tend to focus on whether the defendant's infringements were intentional. *See, e.g.*, *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 685, 695 (W.D. Tex. 2008) (concluding that defendant did not act willfully because the record indicates that he "did not intentionally commit trademark infringement"); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, C.A. No. 17-1700 (MN), 2020 WL 5593932, at *2–3 (D. Del. Sept. 18, 2020) (unpublished) ("Willful trademark infringement requires an intent to infringe or a deliberate disregard of a mark holder's rights." (internal quotation marks omitted)). In making this assessment, courts have considered factors such as the defendant's knowledge of the applicable industry, defendant's behavior after being put on notice that his or her conduct may have been unlawful, the defendant's efforts to defend against the plaintiff's claims, the similarity of the counterfeit mark to the authentic mark, and the strength of the authentic mark. *See Philip Morris*, 547 F. Supp. 2d at 694–95; *Louis Vuitton Malletier v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. June 26, 2002); *New Balance*, 2020 WL 5593932, at *3. Critically, a default by the defendant may be sufficient to support a finding of willfulness. *See Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003).

Applying these principles, the Court concludes that Defendants' counterfeiting activities were willful. As an initial matter, Defendants are in default and—save for a brief appearance to file an answer—have not participated in the litigation. This alone provides ample support for the Court's conclusion, but even if the Defendants had been actively engaged in this case, there would still be plenty of evidence of willfulness. As the Court has already indicated, Defendants' conduct exhibits willfulness because they affirmatively purchased a stamping kit and, having knowledge of the Marks, their value, and the goodwill associated with them, applied near duplications of the Marks to inauthentic goods. *Cf. Philip Morris*, 547 F. Supp. 2d at 694–95. In addition, Defendants engaged in all sorts of cagey behavior to evade the consequences or their actions, such as using fake names and false narratives and responding with hesitancy and combativeness when the authenticity of their merchandise was questioned. Moreover, once others became suspicious of Defendants' activities, they again showed their willfulness by continuing to maintain their listings and reducing their prices in an apparent attempt to offload their inventory. *Cf. id.*; *New Balance*, 2020 WL 5593932, at *3. Thus, Defendants' acts of counterfeiting were willful, and the Court may therefore award enhanced statutory damages. *See* 15 U.S.C. § 1117(c)(2).

### III. Defendants Are Liable for $2,750,000 in Statutory Damages.

As previously indicated, the Court's conclusion that Defendants engaged in willful counterfeiting permits the Court to assess up to "$2,000,000 per counterfeit mark per type of goods." *Id.* Here, all four Marks were used on complete putters and putter heads, and three of the Marks were used on putter grips. Thus, for purposes of calculating enhanced statutory damages, there were 11 distinct uses of counterfeit marks for a maximum award of $22,000,000. Up to this threshold, the Court has broad discretion in calculating damages, as the Lanham Act merely directs the Court to impose the award that it "considers just." *Id.*

Consistent with this directive, courts factor in various considerations when synthesizing an award of statutory damages, including the size and sophistication of the counterfeiting scheme, deterrence interests, the defendant's level of engagement in the litigation, and the defendant's efforts to evade or artificially reduce liability. *See Your True Nature, Inc. v. JF Show Store*, No. 12:23-cv-00107-GPG-NRN, 2024 WL 3340974, at *6–7 (D. Colo. June 21, 2024) (unpublished) (considering deterrence, among other things, in awarding $100,000 for each defendant); *JUUL Labs, Inc. v. Vearaima Inc.*, No. CIV-21-1004-JD, 2023 WL 10350601, at *6 (W.D. Okla. Dec. 13, 2023) (unpublished) (awarding $25,000 "per established sale" and declining to grant plaintiff's full requested award based on "limited information provided about the size or scope of Defendant's counterfeiting and sales"); *New Balance*, 2020 WL5593932, at *3 (awarding $6,000 per violation (for a total of $504,000) based on a finding of willfulness and the conclusion that "a low dollar amount per violation is likely to have a meaningful impact" because defendant did not have "a particularly sophisticated operation" and there was "no evidence in the record that [defendant] made any profits from its scheme"); *Landstar Sys., Inc. v. Am. Landstar Logistics Corp.*, 15-CV-7179 (KAM), 2019 WL 1199389, at *2–5 (E.D.N.Y. Mar. 13, 2019) (unpublished) (awarding the statutory maximum based on defendants' "failure to comply meaningfully with the damages discovery ordered by the court and their destruction and disposal of financial records, after the litigation commenced following plaintiff's cease and desist letters"); *Yelp Inc. v. Catron*, 70 F. Supp. 1082, 1101–04 (N.D. Cal. 2014) (declining to grant plaintiff's requested $2,000,000 award and instead awarding $45,000 because the record contained evidence of only one sale of an infringing service); *Chanel, Inc. v. Pu*, No. 07-2502-KGS, 2009 WL 722050, at *9–10 (D. Kan. Mar. 18, 2009) (unpublished) (declining to grant plaintiff's requested $216,000 award and

considering defendants' lack of meaningful participation and deterrence in awarding $7,500 per mark per type of good for a total of $97,500).

Here, Acushnet requests the maximum $22,000,000 in statutory damages. While the Court does not begrudge Acushnet for taking a big swing, this request overshoots the green. To be sure, Defendants' conduct is blameworthy, but it is not difficult to imagine more egregious counterfeiting schemes. Yes, Defendants took deliberate steps to obtain a stamping kit, apply the Marks to goods, and sell the resulting counterfeits through deceptive means, but they also were not hocking fake products in the thousands through some sort of mass-production enterprise. At the same time, because Defendants declined to cooperate with Acushnet, destroyed some of the evidence of their wrongdoing once the jig was up, and failed to meaningfully participate in this litigation, it is impossible to know at this stage exactly how extensive their counterfeiting scheme was. At minimum, though, the scheme was effective enough to fool sophisticated consumers and pervasive enough to catch the attention of the Scotty Cameron collectors' community at large. All in all, while the statutory maximum is not warranted, a stiff penalty is needed to ensure that Defendants do not simply take a mulligan and attempt this outrageous conduct again in the future. Balancing these factors, the Court concludes that Defendants shall be jointly and severally liable[50] for $250,000 per counterfeit mark per type of good, for a total of $2,750,000 in statutory damages. Because Defendants are, essentially, a single family, this award amounts to a strict reprimand that appropriately communicates the seriousness of their misbehavior without creating an unwarranted disparity with statutory damages awards in other cases.

---

[50] *See Schieffelin & Co. v. Jack Co.*, 725 F. Supp. 1314, 1318 n.2 (S.D.N.Y. 1989) (noting that "all persons and corporations who participate in, exercise control over, or benefit from a trademark infringement are jointly and severally liable").

IV. **Defendants Are Liable for Acushnet's Attorneys' Fees and Costs.**

Finally, Acushnet asks the Court for an additional award of attorneys' fees and costs. A plaintiff who, like Acushnet, successfully establishes a claim under the Lanham Act is entitled to "the costs of the action." 15 U.S.C. § 1117(a). The Lanham Act further provides that an award of reasonable attorneys' fees is permitted in "exceptional cases." *Id.*[51]

Some courts have indicated that a finding of willfulness is sufficient to make a case "exceptional," *see, e.g.*, *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 539 (D.N.J. 2008), whereas others have concluded that something more is required, *see 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 215-16 (2d Cir. 2019) (explaining that there is "no presumption . . . that cases involving willful infringement are necessarily 'exceptional'").

Here, the Court concludes that an award of attorneys' fees is warranted even under this latter standard because Defendants' conduct reached well beyond the threshold of willfulness, as they went so far as to personally stamp counterfeits of the Marks on their goods (no small effort), destroyed evidence of their misdeeds once they were put on notice, and then refused to meaningfully participate in this action after being given ample opportunity to do so. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (holding that an "exceptional" case for purposes of the Patent Act's attorneys' fees provision is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case

---

[51] The Court notes that the Lanham Act appears to allow for an award of attorneys' fees in exceptional cases regardless of whether the plaintiff seeks actual damages and profits under Section 35(a) or statutory damages under Section 35(c). *See* 15 U.S.C. § 1117(a), (c); *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) ("We . . . conclude that an award of attorney's fees is available under section 1117(a) in 'exceptional' cases even for those plaintiffs who opt to receive statutory damages under section 1117(c).")

was litigated"); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 531 (2d Cir. 2018) (extending *Octane Fitness* to attorneys' fees determinations under the Lanham Act).

Thus, the Court concludes that Defendants are liable for Acushnet's reasonable attorneys' fees and costs for this action. To facilitate additional findings by the Court in this regard, Acushnet shall provide an accounting of its attorneys' fees and costs within 30 days of this decision.

## CONCLUSION & ORDER

In summary, based on the foregoing, the Court finds and concludes as follows:

1. Defendants committed violations of Section 32 and Section 43(a) of the Lanham Act.

2. Defendants' violations amounted to counterfeiting.

3. Defendants' violations were willful.

4. As a result, the Court is permitted to award enhanced statutory damages under the Lanham Act.

5. Defendants are jointly and severally liable for $2,750,000 in statutory damages.

6. Acushnet's Motion for Default Judgment (ECF No. 35) is GRANTED IN PART and DENIED IN PART.

7. Default judgment in the above-stated amount shall be entered against Defendants.

8. Acushnet is entitled to recover the costs of this action and its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

DATED this 7th day of March 2025.

BY THE COURT:

Ann Marie McIff Allen
United States District Judge